UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Dawn Green,

      Plaintiff,

v.                         Case No. 15-13479

City of Southfield, *et al.*,      Sean F. Cox
                                 United States District Court Judge

      Defendants.
_____/

**OPINION & ORDER
GRANTING THE SOUTHFIELD DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR SANCTIONS**

On October 4, 2012, Plaintiff Dawn Green was involved in an automobile accident in Southfield, Michigan. She later filed this action, under 42 U.S.C. §§ 1983, 1985(3), and 1986, asserting that officers of the Southfield Police Department violated her constitutional rights, and conspired to do so, in the manner in which they investigated the accident.

This matter is currently before the Court on: 1) a Motion for Summary Judgment filed by the Southfield Defendants; and 2) a Motion by Plaintiff seeking sanctions against the Southfield Defendants relating to discovery. Those motions were fully briefed by the parties and the Court concludes that oral argument is not necessary. For the reason set forth below, the Court shall: 1) GRANT summary judgment in favor of the Southfield Defendants; and 2) DENY Plaintiff's motion for sanctions.

Acting through counsel, D. Rick Martin, Plaintiff Dawn Green filed this action on October 3, 2015.

**Plaintiff's Operative Complaint**

Plaintiff's Second[1] Amended Complaint (D.E. No. 48) is the operative complaint and it asserts four counts against Defendants.

Count I is titled "42 U.S.C. Section 1983 – Constitutional Deprivation" and it is asserted against the Individual Southfield Defendants, Birberick, Bassett, and Labrosse. In this count, Plaintiff alleges that the Southfield Defendants "are civilly liable to Plaintiff pursuant to 42 U.S.C. 1983 for (a) failing to properly and fairly investigate the accident, because of Plaintiff's race and/or sex; (b) failing to administer police protective and investigative services in a nondiscriminatory manner, because of Plaintiff's race and/or sex; and (c) engaging in the selective enforcement of traffic laws, because of Plaintiff's race and/or sex." (D.E. No. 48 at Pg ID 882). Plaintiff alleges that Defendants showed deliberate indifference to (a) the UD 10 Traffic Crash Report which falsely stated that Plaintiff ran the red light; (b) the treatment of Plaintiff differently than the similarly situated white male driver; and (c) the denial of Plaintiff's right to equal administration of police protective and investigative services, because of Plaintiff's race and/or sex. *(Id.)*.

Count II is titled "42 U.S.C. Section 1983 – Constitutional Deprivation" (Count II), and it is a "*Monell* claim" asserted against the City of Southfield.

---

[1]As explained in this Court's March 8, 2017 Order, despite its title, this was actually the *sixth* proposed complaint filed by Plaintiff in this action. (*See* D.E. No. 138 at Pg ID 3051).

Count III is titled "Violation of 42 U.S.C. 1985(3) and 42 U.S.C. 1986" (Count III), and

it is asserted against the Individual Southfield Defendants.  In this count, Plaintiff alleges:

88.     The named Defendants, together with the white male driver that ran the red light and possibly unknown others conspired and committed malicious acts in furtherance of their conspiracy to deprive Plaintiff of her right to equal protection under the law, and to injure Plaintiff and deprive her of rights and privileges of citizens of the United States, and specifically her right not to be intentionally and falsely determined to have disregarded traffic signal, which Defendants knew was unsubstantiated and untrue, and was directly contradicted by an independent eyewitness, the 15 year old passenger in the white male driver's SUV, and objective physical evidence. These conspiratorial acts were in furtherance of their desire to protect the white male driver from liability, because of Plaintiff's race and/or sex.

89.     That Defendants had the authority and power to prevent the conspiracy to (a) falsely state that Plaintiff disregarded traffic signal; (b) deny Plaintiff equal administration of police protective and investigative services; and (c) selectively enforce the traffic laws against Plaintiff, but failed to do so, because of Plaintiff's race and/or sex, and their desire to protect the white male driver from liability.

90.     Defendants, Patterson and possibly others conspired and committed acts in furtherance of a conspiracy to cover-up the police misconduct, and to deprive Plaintiff of her rights under the Constitution, because of Plaintiff's race and/or sex, and their desire to protect the white male driver from liability.

91.     Each of the Defendants and Patterson and possibly others acted in furtherance of their conspiracy by treating Plaintiff differently than the similarly situated white male driver, by denying Plaintiff's right to equal administration of police protective and investigative services, and by selectively enforcing the traffic laws against Plaintiff, because of Plaintiff's race and sex and Defendants' desire to protect the white male driver from liability.

(D.E. No. 48 at Pg ID 884-85).

Count IV is titled "Breach of Contract Claim," and it is asserted against Defendant Geico

Indemnity Company alone.[2]

**Discovery**

Since the inception of this case, it has been very contentious, especially between Plaintiff and the Southfield Defendants. There were numerous discovery disputes, most of which were addressed by the magistrate judge.

Pursuant to the last Scheduling Order issued, (D.E. No. 60 on July 19, 2016), discovery closed on April 19, 2017, and motions had to be filed by May 19, 2017.

In an order issued on June 27, 2017, however, this Court resolved all outstanding discovery issues with all of the parties. (D.E. No. 183). That order allowed the parties to take some additional depositions, addressed some other issues, and allowed the parties to file new summary judgment motions, if they elected to do so.

**Pending Motions**

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .

b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and

---

[2]Although this count was inserted at page 19 of the Second Amended Complaint, Plaintiff's counsel began numbering the paragraphs pertaining to Geico as paragraph 1, so there are two paragraphs 1, two paragraphs 2, etc.

shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Docket Entry No. 60 at 2-3).

### Plaintiff's Summary Judgment Motion As To Defendant Geico

Plaintiff filed a Motion for Summary Judgment as to Geico on May 19, 2017, and it chose not to file a new one after the Court's June 27, 2017 order. Geico responded to that motion on June 9, 2017, asserting that this matter must go to trial as there are numerous issues of fact. Plaintiff did not file a reply brief. This motion will be addressed in a separate opinion and order.

### The Southfield Defendants' Motion For Summary Judgment

On September 29, 2017, Defendants filed a Motion for Summary Judgment. (D.E. No. 185). Defendants' Motion complied with the Court's guidelines discussed above.

On October 19, 2017, Plaintiff's Counsel requested an extension, until, October 30, 2017. for filing a response to Defendants' motion. (D.E. No. 190). This Court granted that request.

On October 30, 2017 – the day the delayed response was due – Plaintiff's Counsel filed another motion requesting an extension. (D.E. No. 192). Plaintiff requested an extension until November 6, 2017.

This Court granted the request for the second extension but stated that it would be the last extension. (*See* November 1, 2017 text-only order).

On November 6, 2017, Plaintiff's Counsel filed a response brief, with no exhibits. (D.E.

No. 193). The next day, November 7, 2017, Plaintiff's Counsel filed "an errata sheet" and attached exhibits in support of the motion. (D.E. No. 194).

Despite having been granted two extensions for filing a response to Defendants' Motion for Summary Judgment, the brief filed by Plaintiff on November 6, 2017 did not comply with this Court's practice guidelines, as it did not contain the required counter-statement of facts described above. This Court therefore issued an Order on November 9, 2017 (D.E. No. 195), wherein the Court struck Plaintiff's November 6, 2017 brief and November 7, 2017 "errata sheet" (D.E. Nos. 193 & 194) for failing to comply with this Court's practice guidelines and ORDERED that "**no later than 9:00 a.m. on November 13, 2017**, Plaintiff shall file a response brief that fully comports with this Court's practice guidelines, along with any exhibits that Plaintiff wishes the Court to consider in connection with Defendant's Motion for Summary Judgment. **The Court further caution[ed] Plaintiff that all exhibits must be in proper form and that the Court shall consider any further 'errata sheet' filings to be improper supplemental briefs that shall be stricken by the Court.**" (*Id.*) (emphasis in original).

Plaintiff filed her response on November 13, 2017, along with exhibits. Despite this Court's warning regarding the form of exhibits, Plaintiff's counsel submitted an unsigned affidavit from Plaintiff, that was not notarized. (D.E. No. 196-1 at Pg ID 6455). After Defendants' November 27, 2017 Reply Brief highlighted that deficiency, Plaintiff's Counsel filed a new affidavit from Plaintiff on December 8, 2017 (D.E. No. 201), without seeking leave to do so.

**Motion For Sanctions**

On October 2, 2017, Plaintiff's Counsel filed a "Motion for Sanctions for Engaging in

Dilatory Tactics," seeking unspecified sanctions against the Southfield Defendants. (D.E. No. 186).

ANALYSIS

**I. The Court Shall Grant The Southfield Defendants' Motion For Summary Judgment (D.E. No. 185)**

Following the close of discovery, Defendants file a Motion for Summary Judgment, seeking summary judgment in their favor as to all of Plaintiff's claims.

**A. Relevant Facts**

Defendants complied with the Court's practice guidelines for motions for summary judgment such that their motion includes a "Statement of Material Facts Not In Dispute" (D.E. No. 185 at Pg ID 5322, "Defs.' "Stmt."). Plaintiff's response brief includes a "Counter-Statement of Disputed Facts" (D.E. No. 196 at Pg ID 6438, "Pl.' s Stmt.").

In response to Defendants' Motion for Summary Judgment, Plaintiff's Counsel ultimately filed a number of exhibits on November 13, 2017. He did not, however, file any portions of the transcript of Plaintiff's own deposition and Defendants' motion attached only a few pages of Plaintiff's deposition. As noted previously, the "affidavit" from Plaintiff that Plaintiff's Counsel filed with his brief is unsigned and was not notarized. In addition, the exhibits filed by Plaintiff's Counsel were mis-numbered and some numbered exhibits were missing. The Court will therefore refer to the exhibits actually filed by Plaintiff's Counsel by the "Pg ID" numbers that appear on the docket, rather the exhibit numbers used by Plaintiff's Counsel.

The following material facts are gleaned from the evidence submitted by the parties. Where is there is conflicting evidence, the facts are construed in the light most favorable to Plaintiff, the nonmoving party.

On October 4, 2012, Plaintiff was in an automobile accident with a man named William Patterson in the City of Southfield, Michigan, at the intersection of Southfield Road and 8 Mile Road. Plaintiff is a black female and Patterson is a white male. (Defs.' Stmt. & Pl.'s Stmt. at ¶¶ 1-2).

Officer Rafid Maya, a Southfield Police Officer, arrived on the scene. Maya testified that he responded to Plaintiff and Patterson. (*Id.* at ¶¶ 3-4).

Maya testified that Plaintiff appeared to be injured and was laying on the ground, and possibly in shock, when he arrived on the scene. He testified that Plaintiff could only say "a few words here and there," and that she "didn't respond too many times" and he didn't want to try to ask her too many questions because she was obviously injured. (Maya Dep. at 26-27). Similarly, Plaintiff testified that while she way laying on the median she was dazed and confused and was in a great deal of pain (Pl.'s Dep. at 136, filed as Defs.'s Ex. 5) and an Affidavit from Harris, submitted by Plaintiff, states that Plaintiff "appeared to be disoriented and in pain." (Harris Affidavit, D.E. No. 196-1 at Pg ID 6560-61). As a result, Maya did not obtain an account of the accident from Plaintiff at the scene.

An ambulance was called to assist Plaintiff. Maya does not recall if he called the ambulance or if citizens called in the accident. (Maya Dep. at 29).

Defendant Keith Birberick, also a Southfield police officer, testified that he responded to the accident scene after Maya did. Birberick testified as follows. When he arrived, all he saw at the scene were paramedics, fire fighters, tow truck drivers, and Officer Maya. Birberick's first priority was to secure the crash scene and there technically were two: 1) the area was Patterson's vehicle was; and 2) the area were Plaintiff's vehicle was located. The two cars were about 200-

300 feet away from one another.  Birberick secured the scene where Patterson's vehicle was and

Maya secured the scene where Plaintiff's vehicle was located.  Birberick walked over to the

scene where Maya was to speak with him, which took some time.  (Defs.' Stmt. & Pl.'s Stmt. at

¶¶ 8-14).  Birberick further testified:

> A.      I spoke to Officer Maya who indicated that Ms. Green was incoherent or out of it.
> Q.      So if she was not out of it, would you have asked her if she could tell you what happened?
> A.      Yes.
> Q.      And why would you do that?
> A.      As I explained before, it's part of the investigation.
> Q.      And she should have her side of the story, right?
> A.      Correct.
> Q.      Because it may be different than what Mr. Patterson told you, correct?
> A.      Yes, sir.
> . . . .
> Q.      And you never attempted to ask her to provide you with her statement as to how the accident happened, correct?
> A.      Yes, sir.
> Q.      Why?
> A.      As the scene Officer Maya indicated that she was out of it, and for lack of better words, and that obviously I saw her being treated by the paramedics from the Southfield Fire Department.

(Ex. 3 to Defs.' Br. at 118-19).

Birberick did, however, have the opportunity to speak to Patterson at the scene and asked

him how the accident occurred.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 16; Defs.' Ex. 6 at 21).

Birberick testified that he also looked at the scene of the accident to determine whether

physical evidence corroborated Patterson's statement.  (Defs.' Stmt. & Pl.'s Stmt. at ¶¶ 17).

Birberick testified that he did not see any skid marks at the scene and that the physical evidence

corroborated Patterson's statement.  (Defs.' Stmt. & Pl.'s Stmt. at ¶¶ 18-19).

During the accident, Patterson had his fifteen-year old grandson, Ryan, as a passenger in

his vehicle. (Defs.' Stmt. & Pl.'s Stmt. at ¶¶ 20).

It is undisputed that Plaintiff was not issued any kind of citation for a civil traffic infraction as a result of the accident. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 24-25).

But Birberick did complete a "UD10" for the accident at the scene. (Birberick's Dep., Defs.' Ex. 3, at 183 & 186).

The Michigan Department of State Police's UD-10 Traffic Crash Report Manual (Pl.'s Ex. 11 at Pg ID 6530) states that the State of Michigan Traffic Crash Report form (UD-10 or UD-10E*)" are prescribed by the Director of the Department of State Police pursuant to Section 257.622 of the Compiled Laws of 1970, as amended" and explains that:

> Michigan law requires that the completed crash reports be forwarded to the Director of the Department of State Police on forms prescribed by that office. UD-10's cannot be available for use in any court action (MCL 257.624) but are used for the purpose of furnishing statistical information on crashes. They also provide the basis for traffic legislation, enforcement, engineering, education, driver licensing and public information generally not available from any other source pursuant to MCL Section 257.624 of the Compiled Laws of 1970, as amended.

(*Id.*) (emphasis in original).

The original UD-10 report completed by Birberick (D.E. No. 185-2 at Pg ID 5368) indicated that, based on the investigation at the scene, Plaintiff disregarded the traffic signal. It further indicated that Plaintiff was taken via ambulance to Providence Hospital and that Patterson declined any medical care. It contained the following narrative, in which Plaintiff was "driver 1" and Patterson was "driver 2:"

> Investigation disclosed that driver 2 was stopped behind another unit in the center lane of NB Southfield.
>
> The Traffic signal for NB Southfield changed to green and the unit in front of driver 2 entered the intersection. When driver 2 entered the intersection he was

struck by driver 1 who was WB on Eight Mile Road.

(*Id*. at Pg ID 5369).

About a week after the accident, Plaintiff obtained a copy of the UD10 from the

Southfield Police Department.  (Pl.'s Dep. at 167-68).  Plaintiff read the UD10 and realized that

she was marked at fault for the accident.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 31).  Plaintiff testified:

> A.    Then I went and they gave me a copy, I paid for a copy, and I looked at it
>        immediately while I was, you know, still there.  I had a seat, so I could,
>        you know, read it or whatever, and I went back up to the desk and asked
>        her was there - how do you go about getting your police – if your police
>        report is wrong, how do you go about getting it amended, and she told me
>        that who I need to contact and she gave me the phone number to, I think
>        Bassett was first.
> Q.    Okay.  Did you get a ticket?
> A.    No.
> Q.    From the October 2012 accident?
> A.    No.
> Q.    So why did you care if the report was wrong?
> A.    Because it was wrong, it had me hitting him.
> Q.    Why did that matter?
> A.    Because it was wrong.  Wrong matters.
> Q.    Why do you think it was wrong?
> A.    Because it had me hitting him.

(Pl.'s Dep. at 168).

In January or February of 2013, Plaintiff retained attorney D. Rick Martin (her attorney

in this case), who later filed a civil action against Patterson and Geico in Wayne County Circuit

Court.  (Pl.'s Dep. at 172; Defs.' Ex. 11).

At some point after the accident, Plaintiff came in contact with a man named Douglas

Harris, who claims to have witnessed the accident.  Plaintiff's attorney obtained an affidavit

from Harris, stating that he witnessed the accident and that he helped pull Plaintiff from vehicle

after the accident.  He states that "[h]ad the officers asked me what I observed, I would have told

them that Mr. Patterson did not stop for the red light" and struck Plaintiff's vehicle. (D.E. No. 196-3 at Pg ID 6560-61). Harris testified that he left the scene of the accident without speaking to the police. (D.E. No. 185-15 at Pg ID 5496).

Plaintiff and her attorney contacted the Southfield Police Department and asked that the UD10 be changed to reflect that Patterson ran the red light. (Defs.' Stmt. & Pl.'s Stmt. at § 45). The Police Department was also told that Harris claimed to have witnessed the accident.

Thereafter, the UD10 was amended, to add Harris as a possible witness and listed his contact information. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 50). In addition, the amended UD10 noted that Patterson had a passenger in his vehicle and listed Ryan's name and date of birth. (D.E. No. 196-3 at Pg ID 6557-58).

After that was done, Bassett felt comfortable with the review that was completed and decided to not dedicate anymore resources to the matter because it was a civil matter, not a criminal matter, so it was closed. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 51).

Plaintiff initiated her motor vehicle negligence lawsuit against Patterson on July 22, 2013.

During that litigation, the parties deposed Patterson, his grandson Ryan, and Harris, all of whom were known or claimed to be present at the scene of the accidence when the accident occurred. During Plaintiff's litigation with Patterson, the parties attended case evaluation, where Plaintiff received a $165,000.00 award, but Patterson rejected the award. Following that, the parties attended a facilitation during which they settled for $95,000.00. (Defs.' Stmt. & Pl.'s Stmt. at ¶¶ 52-56).

Acting through her same attorney, Mr. Martin, Plaintiff filed this action on October 3,

2015.

Two days prior to doing so, a complaint letter from Plaintiff was delivered to the

Southfield Police Department. (D.E. No. 196-3 at Pg ID 6567). In that letter, Plaintiff

complained about the investigation of her accident and the UD10 that had been completed.

During her deposition in this case, Plaintiff testified that had her personal injury case

gone to trial, she could have taken the stand and testified as to her version of how the accident

occurred:

> Q.    If you had gone to trial, you could have sat on the stand and testified to
>        your story, correct?
> A.    I could have, I could have testified to that, yes.

(Pl.'s Dep. at 202).

**B.    Analysis**

Defendants' motion seeks summary judgment as to all of Plaintiff's claims. The

arguments will be addressed in turn.

**1.    The Officers Are Entitled To Qualified Immunity As To Plaintiff's § 1983 Claims.**

To state a claim under § 1983, a plaintiff must set forth facts that, when construed

favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the

United States; 2) caused by a person acting under the color of state law. *Dominguez v.

Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009).

Under the doctrine of qualified immunity, government officials performing discretionary

functions generally are shielded from liability from civil damages insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known. *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008).

Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation. *Dominguez*, 555 F.3d at 549.

"[A] qualified immunity defense can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial." *English v. Duke*, 23 F.3d 1086, 1089 (6th Cir. 1994).

Here, the officers have raised the issue in the instant Motion for Summary Judgment, filed after the close of discovery.

There are three individual Defendants in this case (Birberick, Bassett, and Labrosse). "Each defendant's liability must be assessed individually based on his [or her] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

As explained below, there is insufficient evidence in the record to show that any of the individual Defendants violated Plaintiff's constitutional rights – let alone that any such rights were "clearly established."

The first step in the qualified immunity analysis is to consider whether, viewing the facts in the light most favorable to Plaintiff, could Plaintiff establish a Constitutional violation with respect to any of the three officers.

Here, Count I asserts Plaintiff's claims under § 1983 and those claims are based upon the investigation of the accident.

To the extent that Plaintiff asserts a § 1983 claim based upon the officers' simply having failed to "properly investigate" the accident, such a claim fails as a matter of law. *See, e.g.,*

*Kelso v. City of Toledo*, 77 F. App'x 826, 833 (6th Cir. 2003) (noting that what the plaintiffs were alleging and seeking to prove amounted to "variations on a single theme: that the Toledo Police Department failed to investigate the case properly, and if they had done a better job," more favorable evidence would have been available to the plaintiffs at the time of their personal injury suit, and explaining that "laxity in investigation, without active concealment," does not amount to a constitutional violation.); *Flagg v. City of Detroit*, 447 F.Supp.2d 824, 829 (E.D. Mich. 2006) (noting that a § 1983 claim cannot be predicated upon an alleged failure of the police to properly conduct an investigation); *Jarrett v. Township of Bensalem*, 312 F. App'x 505 (3rd Cir. 2009) (affirming dismissal of § 1983 claim because the mere existence of an allegedly incorrect automobile-accident police report does not implicate constitutional rights). Simply stated, there is no constitutional right to an error-free investigation of an automobile accident by the police.

Plaintiff has only alleged a potentially viable § 1983 claim based upon the investigation because she asserts: 1) an equal protection claim, based upon Plaintiff's allegation that the officers conducted a *discriminatory* investigation of the accident because of Plaintiff's race or sex; and 2) that, by virtue of their investigation, Defendants violated her *constitutional right to access of the courts*.

### Equal Protection Claim

The equal protection provision of the United States Constitution demands that persons similarly situated be treated alike. U.S. Const. amend XIV, § 1; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

In order to establish an equal protection claim, Plaintiff must show that similarly-situated

persons received different, more favorable treatment than her, and that the difference in treatment was due to purposeful sex or race discrimination against her.

As Defendants' motion notes, to be similarly situated, a plaintiff must show that she was treated differently than those similarly situated in all material respects. (Defs.' Br. at 10) (citing *Loesel v. City of Frankenmuth,* 692 F.3d 452, 462 (6th Cir. 2012). This is analogous to the burden in employment discrimination disparate treatment claims when a plaintiff must show that she was treated less favorably than a similarly situated non-protected employee, without "differentiating or mitigating circumstances" for doing so. *See, e.g., Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir. 1992).

In opposing a motion for summary judgment, "it is plaintiff who possesses the burden of demonstrating that the defendants treated similarly situated individuals in a disparate manner." *Buchanan v. City of Bolivar, Tenn.,* 99 F.3d 1352, 1360 (6th Cir. 1996).

As a threshold matter, Plaintiff must establish that the Defendant officers treated similarly situated persons disparately. *Ryan v. City of Detroit*, 698 F. App'x 272, 279 (6th Cir. 2017). The question of whether persons are similarly situated "may in some cases be a question of fact for a jury." *Id*. at 280. "However, [the Sixth Circuit has] upheld grants of summary judgment where no reasonable juror could find that the plaintiff's comparators were similarly situated in 'relevant' or 'material' respects." *Id*.

Here, Plaintiff asserts that the Officers violated her rights under the Equal Protection Clause by not giving her an opportunity to provide her version as to how the accident occurred. (Pl.'s Br. at 21). Plaintiff claims that the officers treated her (a black female) less favorably than Patterson (a white male) because they asked for his account of the accident while at the accident

scene but did not ask for hers.

The fatal flaw with that argument is that Plaintiff and Patterson are not similarly situated in the relevant or material respects and no reasonable jury could find otherwise based upon the record evidence before this Court. That is because, while Patterson was uninjured and readily able to speak with the officers at the scene of the accident, answer questions, and give them a description of what he believes occurred, Plaintiff was not.

Maya testified that Plaintiff was clearly injured and was laying on the ground, and possibly in shock, when he arrived on the scene. He testified that Plaintiff could only say "a few words here and there," and that she "didn't respond too many times" and he didn't want to try to ask her too many questions because she was obviously quite injured. (Maya Dep. at 26-27). Similarly, Plaintiff herself testified that while she way laying on the median she was dazed and confused and was in a great deal of pain (Pl.'s Dep. at 136, filed as Defs.'s Ex. 5). An affidavit from Harris, submitted by Plaintiff, states that Plaintiff "appeared to be disoriented and in pain." Birberick testified that he did not try to get a statement from Plaintiff at the scene because Officer May had told him that Plaintiff "was out of it," and Birberick saw that Plaintiff was being treated by paramedics for her injuries. (Ex. 3 to Defs.' Br. at 118-19).

This Court therefore concludes that Plaintiff has failed to meet her threshold burden of establishing that the Defendant officers treated similarly situated persons differently. The officers are entitled to qualified immunity as to Plaintiff's equal protection claim.

### Backward-Looking Denial of Access To Court Claim

"The Supreme Court has recognized a constitutional right of access to the courts,

whereby a plaintiff with a nonfrivolous legal claim has the right to bring that claim to a court of law." *Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013). The Sixth Circuit has stated that "the right of access to the courts finds support in several provisions" of the United States Constitution, including the Due Process Clause of the Fourteenth Amendment, the First Amendment, and the Privileges and Immunities Clause of Article IV. *Swekel v. City of River Rouge*, 119 F.3d 1259, 1261-62 (6th Cir. 1997). "Denial of access to the courts claims may be 'forward-looking' or 'backward-looking.'" *Flagg,* 715 F.3d at 173.

"In forward-looking claims, the plaintiff accuses the government of creating or maintaining some 'frustrating condition,' that stands between the plaintiff and 'the courthouse door.'" *Id*. "The object of the suit is to eliminate the condition, thereby allowing the plaintiff, usually an inmate," "to sue on some underlying legal claim." *Id*. Here, nothing prevented Plaintiff from filing a personal injury suit against Patterson and she did so. Therefore, Plaintiff does not assert a forward-looking claim in this action. What Plaintiff asserts here is a "backward-looking" access-to-courts claim.

"In backward-looking claims," "the government is accused of barring the courthouse door by concealing or destroying evidence so that the plaintiff is unable to ever obtain an adequate remedy on the underlying claim." *Flagg,* 715 F.3d at 173. While backward-looking claims "are much less established that forward-looking claims," the Sixth Circuit does recognize them. *Id.* The essential elements of a backward-looking denial-of-access claim are: 1) a non-frivolous underlying claim; 2) obstructive actions by state actors; 3) "substantial prejudice" to the underlying claim that cannot be remedied by the state court; 4) a request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable. *Id*. at

174. Moreover, a plaintiff "must make out the denial-of-access elements against each defendant in conformance with the requirements of § 1983." *Id.*

In *Swekel,* the Sixth Circuit further distinguished between a denial of access claim where the alleged abuse "occurred pre- or post-filing," and explained:

> When the abuse transpired post-filing, the aggrieved party is already in court and that court usually can address the abuse, and thus, an access to courts claim typically will not be viable. *If the abuse occurs pre-filing, then the plaintiff must establish that such abuse denied her "effective" and "meaningful" access to the courts. She can do this only by showing that the defendants' actions foreclosed her from filing suit in state court or rendered ineffective any state court remedy she previously may have had.*

*Swekel,* 119 F.3d at 1263 (Emphasis added).

Plaintiff's brief does not even set forth the essential elements that must be met in order to proceed with her claim, much less present evidence to make the required showings. Rather, Plaintiff simply assert that she "has shown that she was forced to settle her state court case for an inadequate amount because of Defendant Birberick's and officer Maya's cover-up of the true facts," which she says includes the officers not getting her statement at the scene and not getting statements from witnesses at the scene. (*See* Pl.'s Br. at 25). Plaintiff asserts that, due to those actions, she was "substantially prejudiced in state court because she was deprived of credible witnesses to rebut the Defendant Birberick's finding and the white male's assertion that she ran the red light at trial." (*Id.*).

Defendants' brief explains why Plaintiff cannot establish a viable denial of access to courts claim based on the record evidence here:

> Plaintiff asserts that an error on the UD10 denied her access to the Courts.

19

However, a UD10 and the statements contained therein could not have been submitted as evidence in the underlying litigation because police reports are inadmissible hearsay. See *Galli v. Reutter*, 148 Mich. App. 313, 318; 384 N.W.2d 43 (1985). Additionally, UD10s, completed as required by MCL 257.622, "shall not be available for use in a court action." MCL 257.624. Thus, Plaintiff's reliance on the UD10 to settle her case in the underlying litigation was misguided. The statements in the UD10 did not render her access to the courts ineffective because she should have ignored the UD10 when making her decision to settle because it holds no evidentiary value whatsoever, which should have been readily apparent to her attorney, who should have advised her of the same.

Plaintiff's claim also fails because she effectively used the court system: she filed her complaint on July 22, 2013, she conducted discovery, she deposed witnesses, she went through case evaluation, and she facilitated the case. She settled it because she was told that the UD10 marking her at fault was detrimental to her case, despite the fact that it was inadmissible into evidence. She could have testified at trial. She could have called Harris, who claimed that Patterson was at fault for the accident, at trial, knowing that the UD10 could not impact his testimony. Instead, she decided to forgo the opportunity to meaningfully use the Court system and accepted a settlement.

(Defs.' Br. at 15).

The Court agrees with Defendants that the officers are all entitled to qualified immunity on this claim because Plaintiff cannot establish the essential elements of her backward-looking denial-of-access-to-courts claim, which is based upon pre-filing conduct.

Plaintiff can meet the first element, a non-frivolous underlying claim, because she had a non-frivolous personal injury lawsuit against Patterson.

Plaintiff has not, however, presented any evidence of any "obstructive conduct," on the part of the officers because she has not presented any evidence that they *destroyed or concealed evidence*. Rather, she argues that the officers could have performed a better or more thorough investigation, which would have uncovered witnesses that may have been favorable to her case.

And most notably, Plaintiff cannot establish that the officers' actions denied her effective

or meaningful access to the courts, such that her state court remedy was rendered ineffective. That is because, regardless of the officers' investigation, Plaintiff was aware of the alleged witnesses to the accident (Patterson's grandson and Harris) and could have called them to testify at trial in her personal injury action if she chose to do so. Plaintiff also could have testified and told her own version of how the accident occurred at trial – as she acknowledged in her deposition in this case:

> Q.    If you had gone to trial, you could have sat on the stand and testified to your story, correct?
>
> A.    I could have, I could have testified to that, yes.

(Pl.'s Dep. at 202). In addition, as Defendants have stressed, per statute, the UD10 was *inadmissible at trial*. Accordingly, on this record, Plaintiff cannot establish a denial of access to courts claim and all three officers are entitled to qualified immunity.

### 2.    Plaintiff Cannot Proceed With A *Monell* Claim Against The City.

Defendants' motion asserts that Plaintiff cannot proceed with a *Monell* claim against the City because she cannot present evidence of an unconstitutional policy that Southfield has, and cannot adduce sufficient evidence to show that the City failed to train or supervise its officers. The Court need not reach those arguments, however, because, as Defendants' motion notes, a simpler reason requires dismissal of this claim. It is well-established that "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).

### 3.    Plaintiff's Conspiracy Count Fails Also.

Count III asserts civil conspiracy claims against the Defendant officers under 42 U.S.C. § 1985(3) and § 1986.

To establish a civil conspiracy under § 1985(3), a plaintiff must show that: 1) two or more persons conspired; 2) for the purpose of depriving the plaintiff of the equal protection of the laws due to racial or class-based animus and that the conspirators; 3) committed an act in furtherance of the object of such conspiracy; 4) that injured the claimant. *Maxwell v. Dodd*, 662 F.3d 418 (6th Cir. 2011).

Section 1986 "establishes a cause of action against anyone, who has knowledge of a conspiracy under § 1985, and 'having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005); 42 U.S.C. § 1985.  "But '[w]here plaintiff has stated no cause of action under § 1985, no cause of action exists under § 1986." *Id.*

Defendants' Motion for Summary Judgment asserts that Plaintiff's civil conspiracy claims fail as a matter of law.  The Court agrees.

"Under both federal and Michigan law, civil conspiracy claims are derivative.  They are cognizable only insofar as there is an underlying cognizable" claim for a constitutional violation. *Van Buren v. Crawford County*, 2017 WL 3479546 (E.D. Mich. 2017) (citing *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003)); *see also Wiley v. Oberlin Police Dept.*, 330 F. App'x 524, 530 (6th Cir. 2009) (explaining that, '[s]imiliar to the municipal liability claim, [the plaintiff] cannot succeed on a conspiracy claim because there was no underlying constitutional violation that injured her."); *Bauss v. Plymouth Twp.*, 233 F. App'x 490, 500 (6th Cir. 2007); *Thompson v. City of Memphis*, 86 F. App'x 96, 103 (6th Cir. 2004) (explaining that conspiracy

22

claim under § 1985(3) depends on the plaintiff successfully establishing the alleged constitutional violation); *Umani v. Michigan Dept. of Corrections*, 432 F. App'x 453,462 (6th Cir. 2011) (same).

Here, Plaintiff alleges a conspiracy by the officers and Patterson, to violate Plaintiff's constitutional rights to equal protection and access to the courts. Because Plaintiff cannot establish either of the alleged constitutional violations, Plaintiff's conspiracy claims fail too.

## II.     The Court Shall Deny Plaintiff's Motion for Sanctions (D.E. No. 186).

On October 2, 2017, Plaintiff filed a "Motion for Sanctions for Engaging in Dilatory Tactics." (D.E. No. 186).   In this motion, Plaintiff's Counsel asks this Court for unspecified sanctions against Defense Counsel for: 1) for having initially responded that the City had no record of Plaintiff's October 1, 2015 letter complaining about how here investigation was handled, when, in fact, the letter was received; and 2) for having belatedly produced some training materials.  Plaintiff's Counsel was ultimately provided with the discovery at issue. Moreover, neither of these items change the outcome of Defendants' Motion for Summary Judgment.  Finally, to the extent that Plaintiff's Counsel is arguing that Defense Counsel's actions have caused him to incur unnecessary expenses, the Court rejects that argument.  This case has been very contentious, on both sides.  And since the inception of this case Plaintiff's counsel has failed to  follow applicable court rules, has filed numerous "errata sheets" to correct drafting and filing errors, failed to follow this Court's practice guidelines, failed to meet deadlines, etc. – all of which has caused both the Court and opposing counsel to spend more time than should have been necessary in this case.  The Court shall deny this motion.

**CONCLUSION & ORDER**

For the reasons set forth above, **IT IS ORDERED** that: 1) the Southfield Defendants'

Motion for Summary Judgment is **GRANTED** and the claims against the Southfield Defendants

shall be **DISMISSED WITH PREJUDICE**; and 2) Plaintiff's Motion for Sanctions is

**DENIED**.

      **IT IS SO ORDERED.**

                      s/Sean F. Cox

                      Sean F. Cox

                      United States District Judge

Dated:  March 7, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on
March 7, 2018, by electronic and/or ordinary mail.

                      s/Jennifer McCoy

                      Case Manager